IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| UBS FINANCIAL SERVICES INC., | : |
| Plaintiff, | : |
| v. | : Case No. 2:19-cv-4550 |
| MICHAEL PLATTE, LANCE WHITE, and MATTHEW PENROD, | : |
| Defendants. | : |

**COMPLAINT FOR INJUNCTIVE RELIEF**

Plaintiff UBS Financial Services Inc. ("UBS") states as follows for its Complaint against Defendants Michael Platte ("Platte"), Lance White ("White"), and Matthew Penrod ("Penrod") (collectively "Defendants"):

**INTRODUCTION**

1. UBS brings this action to protect its employee and client relationships and prevent further irreparable harm to its business from Defendants' breaches of their contractual obligations to UBS, including Platte's confidentiality and employee and customer non-solicitation obligations and White and Penrod's confidentiality and customer non-solicitation obligations.

2. Beginning in 2018, Platte, who was the branch manager of UBS's New Albany office, began covertly "shopping" UBS's New Albany office to the highest bidder. His plan was to establish a new branch office in New Albany for one of UBS's competitors with himself as branch manager. He would bring with him the key producers and support staff of the UBS office, who would in turn solicit their UBS clients to transfer their accounts to the new firm.

3. For more than a year, Platte – in flagrant breach of his contractual obligations and duty of loyalty as branch manager – worked secretly to implement this plan, meeting with different

competitor firms. He eventually found a willing partner in Morgan Stanley, which agreed to pay Platte and his colleagues extraordinary transition packages. Although the exact details are not known at this point, UBS believes the transition packages promised to Platte and his colleagues could be worth more than $25 million. Morgan Stanley also agreed that Platte would be manager of a new branch office in New Albany.

4. With the financial terms in place and with Platte's position as Branch Manager secured, UBS believes the first resignations to Morgan Stanley started in September 2019 when three UBS financial advisors generating nearly $2.5 million in annual revenue resigned to join Morgan Stanley. Due to suspicions about his role in those departures and rumors of additional departures, Platte was placed on administrative leave on September 30, 2019 and terminated on October 2, 2019. He was immediately hired by Morgan Stanley. Defendants White and Penrod, along with several other members of their team, resigned five days later on October 7, 2019 and immediately joined Morgan Stanley. In addition, several other current and former UBS staff employees resigned and became employed by Morgan Stanley.

5. Immediately upon joining Morgan Stanley, upon information and belief, Platte, White and Penrod began contacting UBS clients about transferring their accounts to Morgan Stanley and, in so doing, breached the non-solicitation covenants contained in a variety of agreements they signed with UBS. In addition, UBS believes Platte, White and Penrod violated the confidentiality provisions in those agreements and misappropriated UBS's trade secrets by their conduct.

6. The departures of Platte and these employees has devastated UBS's New Albany office. The seven financial advisors (including Platte) hired by Morgan Stanley generated more

than $8 million in annual revenue for UBS and serviced $1.1 billion in assets under management. They accounted for more than 60% of the branch office's revenue.

7. The merits of this dispute are subject to mandatory arbitration before the Financial Industry Regulatory Authority ("FINRA"). However, under Rule 13804 of the FINRA Code of Arbitration Procedure, UBS is exercising its right to seek preliminary injunctive relief in this Court. In compliance with the FINRA Code, UBS has simultaneously filed a Statement of Claim with FINRA against Defendants and their new employer, Morgan Stanley.

## PARTIES

8. UBS is a Delaware corporation with its principal place of business in the State of New York. UBS is a securities broker-dealer and commodities futures commission merchant throughout the United States and a FINRA member firm.

9. Until recently, Defendants were UBS employees. Platte was Branch Manager of UBS's New Albany, Ohio branch for over 12 years before his employment was terminated on October 2, 2019.

10. White and Penrod were employed with UBS as Financial Advisors at the New Albany office until they resigned on October 7, 2019.

11. Platte and Penrod reside in Ohio, and White resides in Ohio and/or Florida.

## JURISDICTION AND VENUE

12. The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interests and costs.

13. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2). A substantial part of the events giving rise to UBS's claims occurred in this judicial district.

## BACKGROUND FACTS

14. In January 2007, Platte and Penrod began working as Financial Advisors with UBS following UBS's acquisition of McDonald & Co. Investments (aka McDonald-Key Investments), their previous employer. White later joined UBS as a Financial Advisor in September 2008.

15. Before his UBS employment ended, Platte had been the producing Branch Manager for the New Albany branch office for a number of years.

16. Prior to the events at issue here, UBS's branch office in New Albany was profitable and thriving. As of January 1, 2018, the branch had 16 financial advisors and more than a dozen staff and management employees. The branch had annual revenues of approximately $20 million on client assets of over $2 billion.

17. As part of their duties at UBS, Defendants had access to extensive confidential financial records and information about UBS and UBS's clients. Among other things, Defendants had access to highly confidential UBS client files. These files contain financial information regarding each client, including client identity, address, telephone numbers, transactional history, tax information, personal financial data, banking information and investment objectives, among other confidential and proprietary data. This information has been collected at great expense to UBS, is not easily duplicated, and would be extremely valuable to a competitor.

18. Defendants, and Platte in particular as Branch Manager, also had access to confidential financial records and information regarding UBS's New Albany branch and the employees working at that branch. This includes information regarding the Financial Advisors' client base and most significant client relationships, and the performance and strengths and weaknesses of each of the branch's employees. This information would likewise be useful to a competitor such as Morgan Stanley.

**Defendants' Agreements With UBS**

19. Throughout their employment, Defendants entered into a number of agreements and were subject to a number of policies that restrict them from using or disclosing confidential information outside of UBS and interfering with UBS's client relationships.

20. On January 20, 2007, Platte and Penrod each signed an Agreement Relating to Intellectual Property and Confidential Information in consideration for their employment at UBS. A copy of Platte's Confidentiality Agreement is attached as Exhibit A, and a copy of Penrod's Confidentiality Agreement is attached as Exhibit B. White signed his Confidentiality Agreement on September 19, 2008, a copy of which is attached as Exhibit C (collectively the "Confidentiality Agreements").

21. The Confidentiality Agreements restricted Platte and Penrod's use and disclosure of UBS's information during and after their employment at UBS. Specifically, the Confidentiality Agreements provide as follows:

> During the period of my employment and subsequent thereto, I will keep in confidence and will not, except as required in the conduct of UBS Financial Services Inc.'s business or as authorized in writing by UBS Financial Services Inc.'s intellectual property counsel, publish, disclose or use, or authorize anyone to publish, disclose, or use, any non-public information I may in any way acquire, learn, develop, or create by reason of my employment by UBS Financial Services Inc., which gives UBS Financial Services Inc. an opportunity to obtain an advantage over competitors who do not know or use it. This includes, for example, customer lists, marketing plans, financial data, business data, computer software, etc. ("Confidential Information") unless the specific item of UBS Financial Services Inc.'s Confidential Information: (a) was known to me prior to its receipt as evidenced by written records, (b) is now in, or hereafter (through no breach of this agreement) becomes general public knowledge, or (c) prior to my disclosure, dissemination or use, was lawfully acquired by me without any obligation to retain the information in confidence. I will not engage without the prior written consent of UBS Financial Services Inc.'s intellectual property counsel, while I am employed by UBS Financial Services Inc. in any outside activity or employment in the

> faithful performance of which it could be reasonably anticipated that I would use or disclose UBS Financial Services Inc.'s Confidential Information.

*See* Exhibits A-C at Section 4

22. On August 10, 2016, Platte signed a Letter of Understanding in connection with his employment as Branch Office Manager ("BOM Agreement"). A copy of the BOM Agreement is attached as Exhibit D.

23. In consideration for entering into the BOM Agreement, UBS continued Platte's employment and provided him with significant benefits, including substantial compensation, benefits, and resources as set forth in the BOM Agreement.

24. In the BOM Agreement, Platte agreed that, during his employment and for one year thereafter, he would not solicit UBS employees or clients. Specifically, the BOM Agreement provides as follows:

> You understand and agree that, in furtherance of carrying out your duties pursuant to your employment with UBS, the Firm will provide you with access to proprietary and confidential information relating to UBS Group (as defined below) and its clients. As a condition of your receiving such information and your continued employment with the Firm, you agree that, to the fullest extent permissible by law, during your employment and for a period of one year from the termination date of your employment (whether voluntary or involuntary) you will not, directly or indirectly, for yourself or any third party: (1) solicit, influence, induce, recruit or cause any employee of UBS Group, or its subsidiaries or affiliates to terminate his or her employment with UBS Group for the purpose of joining, associating or becoming employed with any business wherever located for which you are or anticipate becoming an employee, owner, partner, investor, member, agent, director, consultant, independent contractor or otherwise associated in any way whatsoever; or (2) solicit or interfere with any of the UBS Group clients for whom you either performed, supervised or solicited work from during the one year period prior to the termination of your employment. It is further understood and agreed that the provisions of subsections (1) and (2) of this paragraph are in addition to and not in lieu of any other agreement between you and UBS Group concerning the solicitation of employees or clients.

6

> UBS Group shall be entitled to injunctive relief in the event of a breach of this paragraph.

See Exhibit D at Section 7.

25. In addition, Platte received performance-related awards from UBS during the course of his employment. The award agreements that he signed in connection with receiving these awards likewise prohibited him from soliciting UBS clients he serviced or whose names became known to him during his UBS employment.

26. Like Platte, White and Penrod received various performance-related awards from UBS during the course of their employment. The award agreements they signed in connection with receiving the awards contained non-solicitation and confidentiality restrictions.

27. By way of example, Platte, White and Penrod signed Deferred Cash Award Agreements in February 2019 in connection with receiving loans from UBS. A copy of White's Deferred Cash Award Agreement is attached as Exhibit E, a copy of Penrod's Deferred Cash Award Agreement is attached as Exhibit F, and a copy of Platte's Deferred Cash Award Agreement is attached as Exhibit G. The Deferred Cash Award Agreements provide as follows with respect to non-solicitation and confidentiality of information:

> 6. <u>Confidential Information</u>. Employee may not directly or indirectly use, maintain, take or disclose any Confidential Information, except (i) in the course of carrying out Employee's duties for UBSFS during Employee's employment, or (ii) as otherwise required by law or governmental agency with jurisdiction, or (iii) as otherwise permitted by this Agreement. "Confidential Information" as used herein includes but is not limited to any nonpublic information concerning UBS Group, its financial data, strategic business plans, products and product development, services, client relationships and prospective client relationships, client lists and contact information, client information (including but not limited to clients' past and present financial conditions, investment practices, preferences, activities, objectives and plans and other client data Employee obtained while in UBSFS' employ), marketing plans, and any other trade secrets or confidential or proprietary information. Employee further expressly agrees that, in

the event his or her employment terminates, Employee's use of Confidential Information, including but not limited to any information referring or relating to clients of UBSFS, former clients of UBSFS and prospective clients of UBSFS, must immediately cease and that Employee must immediately return, destroy or delete, any Confidential Information whether in hard copy or computerized form, including in any electronic device owned by Employee.

7. <u>Non-Solicitation of Clients</u>:  Subject to applicable law and Paragraph 8 of this Agreement, in the event Employee's employment with UBSFS is terminated for any reason whatsoever, whether voluntarily or involuntarily, Employee agrees, for a period of one year from the date of termination or until such time that all amounts owed by the Employee to UBSFS and all related entries have been fully repaid, whoever is earlier, to not solicit, directly or indirectly, any of the clients who maintain accounts at UBSFS ("Clients of UBSFS") whom Employee serviced during his/her employment at UBSFS or other Clients of UBSFS whose names became known to Employee while in the employ of UBSFS.

"Solicit" as set forth in this paragraph means that the Employee will not initiate, whether directly or indirectly, any contact or communication of any kind whatsoever, for the purpose of inviting, encouraging or requesting a client or that may have the effect of inviting, encouraging or requesting a client:

(a) to transfer his/her UBSFS account(s) to the Employee or his/her new employer; or

(b) to open a new account with Employee or his/her new employer; or

(c) to otherwise discontinue his/her existing business relationship with UBSFS.

*See* Exhibits E-G at Sections 6–7.

28. Platte, White and Penrod, along with UBS Financial Advisor Stephanie McCurdy, operated as a financial advisor team.  They signed a Financial Advisor Team Agreement in January 2017 (FA Team Agreement) that contained a non-solicitation covenant, as follows:

If the employment of any Team Member (current or former) terminates for any reason, that Team Member will not, for a period of one year from the employment termination date, solicit any clients that were serviced by the Team.  **This provision does not**

8

> **apply to client accounts the departing Team Member introduced to the Team, either at its inception or during its existence**. Nothing in this Non-Solicitation provision limits any rights UBS or any Team Member may have under the Protocol for Broker Recruiting ("Protocol") (emphasis in original).

A copy of the FA Team Agreement is attached as Exhibit H.

29.   Platte and Penrod also had a partnering arrangement on certain accounts with UBS Private Wealth Advisors in the Private Wealth Management Group.  Platte, Penrod and UBS Wealth Advisor Leslie Lauer signed a Financial Advisor/Private Wealth Advisor Partnering Agreement in October 2015 (PWA Partnering Agreement) that incorporates an Addendum, which contained a non-solicitation covenant, as follows:

> ELEVENTH:
>
> A.   Upon the termination of employment with UBS Financial Services Inc. of any party or former party to this Agreement for any reason whatsoever, the departing party or former party agrees that, in addition to any other non-solicitation obligations he/she may have in any other agreement with UBS Financial Services Inc. or its predecessors, including but not limited to those contained in:
>
> - Agreement for Financial Advisors in the Development Program or similar training agreement;
>
> - Team Agreements;
>
> - Any loan documents (including but not limited to loan documents generated in connection with an EFL, Transition Loan, CVS loan, Strategic Objective Advance or the GrowthPlus program);
>
> - Corporate Employee Financial Services Program agreements (an account servicing agreement between a party and UBS and any services agreement between UBS and the company sponsoring the stock benefit plan);
>
> - Business Referral Agreements; and/or
>
> - Transitioning. Receiving and/or Retiring Financial Advisor Agreement,

9

> he/she will not solicit, for a period of one year from the date of termination of the departing party's employment, any clients of UBS Financial Services Inc. serviced pursuant to this Agreement.
>
> B.      For purposes of this non-solicitation provision, "solicit" means that the departing party will not initiate, whether directly or indirectly, any contact or communication, of any kind whatsoever, for the purpose of inviting, encouraging or requesting a client, or that may have the effect of inviting, encouraging or requesting a client: (a) to transfer his or her UBS Financial Services Inc. account(s) to anyone else including to the departing party or his or her new employer; or (b) to open a new account with the departing party or anyone else including to his or her new employer; or (c) to otherwise discontinue his or her existing business relationship with UBS Financial Services Inc.  Advisors expressly agree that no announcements of their departure from UBS Financial Services Inc. will be mailed by them or their new employer to the clients serviced pursuant to this Agreement.

A copy of the PWA Partnering Agreement is attached as Exhibit I.

30.     Moreover, Platte, White and Penrod were each subject to UBS policies requiring employees to maintain the confidentiality of business records and client information, and they annually certified that they would adhere to those policies.

### Platte Begins To Shop The New Albany Branch To UBS's Competitors

31.     As of January 1, 2018, the Financial Advisors at the New Albany branch were broadly organized into four teams: (a) the Platte/White/Penrod/McCurdy/McCoy team; (b) the Covert/Simpson/Reta team; (c) the Dankworth/Vuticevski team; and (d) the Finney/Bibler/Panfil/ Shaffer/Altschule team.  One other Financial Advisor at the branch worked on his own outside of any team.

32.     Upon information and belief, in early 2018, while the UBS Branch Manager, Platte began discussing with White and Penrod and with members of the Covert/Simpson/Reta and Finney/Bibler/Panfil/Shaffer/Altschule teams the possibility of leaving UBS *en masse* to join a competitor firm and form a new office in New Albany with Platte as Branch Manager.  These

10

teams collectively represented over $14 million of the New Albany branch's $20 million in production.

33. Platte knew that these significant producers were unhappy about certain developments within UBS in early 2018, including with respect to the firm's introduction of a new form of agreement relating to annual compensation awards. Rather than attempting to address their concerns and advising UBS senior management so that it could take appropriate steps, Platte, for over a year, fanned the flames and used this information about their discontent as ammunition to consider joining him in leaving the firm. Platte's conduct was an egregious breach of his duty of loyalty under UBS policy and applicable law and his contractual obligations not to influence, induce, or recruit employees to leave.

34. Acting as spokesman for these individuals various individual Financial Advisors for whom he had supervisory responsibility, Platte began negotiations with several different competitor firms, including Raymond James and Morgan Stanley, about the possibility of lifting out some of the UBS teams and opening a new branch office for those firms in New Albany. These discussions continued for much of 2018.

35. Upon information and belief, in fall 2018, the members of the Finney/Bibler/Panfil/Shaffer/Altschule team became concerned about the risk of being part of an *en masse* move spearheaded by Platte – specifically, that it could be considered an illegal raid. As such, they began their own discussions with other firms, eventually settling on Wells Fargo Advisors. They resigned from UBS on November 2, 2018 and joined Wells Fargo in Westerville, Ohio. At no time did Platte ever inform UBS management that the Finney team was unhappy and looking to leave for the competition.

**Platte Continues Negotiations In 2019, Ultimately Settling On Morgan Stanley,
And Recruits UBS Employees To Join Him In Leaving**

36. Undeterred by the Finney/Bibler/Shaffer/Panfil team's decision to leave on their own, Platte continued to engage, he continued discussions with the other competitor firms. Specifically, he engaged in serious and detailed discussions with Raymond James and Morgan Stanley, at all times representing not only himself, but also the other members of his team and the Covert/Simpson/Reta team.

37. In May 2019, Platte told UBS financial advisor Stephanie McCurdy about his plans. McCurdy had worked under Platte in the New Albany office for a number of years, but had only signed a team agreement with Platte, White and Penrod in 2017. McCurdy was not involved in the initial discussions about leaving UBS and was only "brought under the tent" in May 2019.

38. Platte told McCurdy that he and the other members of the team were going to be leaving UBS and that he wanted her to join them. Platte said that they were considering a number of firms, including Morgan Stanley and Raymond James. Platte later told McCurdy that they had settled on Morgan Stanley.

39. When McCurdy was not immediately receptive to the plan, Platte repeatedly and persistently solicited her over the course of the summer to make a move with him and the others to a competitor firm. On behalf of Platte and Morgan Stanley, Penrod also repeatedly solicited McCurdy to move with them.

40. Upon information and belief, Platte also recruited Penrod, White, UBS staff employees Karin Aey, Sam McCoy, Shane Moran (all of whom resigned the same day as Penrod and White to join Morgan Stanley), and has recruited other UBS employees to leave UBS.

### UBS Confronts Platte And Another Team Leaves

41. UBS management eventually began hearing that Platte was "shopping" the office to competitor firms.

42. On September 5, 2019, the Managing Director and Northern Ohio Market Head for UBS met with Platte to discuss these rumors. Platte admitted that he and his teammates were talking to other firms. He denied any knowledge of other teams talking to competitor firms.

43. The very next day, on September 6, 2019, the Covert/Simpson/Reta team resigned to join Morgan Stanley. Platte denied being involved with the Covert/Simpson/Reta team in their move to Morgan Stanley. Their accounts were reassigned to the remaining financial advisors in the New Albany branch, including to Platte's team, as well as to advisors in the firm's Upper Arlington branch, in order to provide coverage for client needs and seek to retain them for UBS.

44. Despite being compromised and in a conflict of interest position due to his ongoing disloyalty and his plan to join the Covert/Simpson/Reta team at Morgan Stanley shortly thereafter, Platte and his teammates accepted the account reassignments. In addition, Platte in his capacity as branch manager had a duty to the firm to ensure that all reasonable efforts were made by the branch to try to retain the business. Again, his conflicted position prevented Platte from fulfilling his duties to UBS in this regard.

### Platte Is Terminated And Joins Morgan Stanley With White And Penrod

45. Notwithstanding his denials, the rumors continued of Platte's involvement with the departure of the Covert/Simpson/Reta team and his own imminent departure to Morgan Stanley.

46. Due to the rumors and other credible information, Platte was interviewed by UBS Employee Relations personnel about these matters at the end of September 2019. White and Penrod were also interviewed by UBS Employee Relations.

47. After his interview with UBS Employee Relations on October 1, 2019, Penrod was observed printing a number of UBS client "profile pages" from UBS's computer system and possibly removing them from his office. He was confronted about his actions and he claimed it was for the purpose of conducting client meetings. However, an e-mail only two days prior to the his suspicious printing (on September 30, 2019), made clear that Penrod intended to resign to join Morgan Stanley and was prepared to do so on a moment's notice. The day after he was confronted about his behavior, at least some of the client profile pages were returned to his office in the UBS New Albany branch.

48. UBS placed Platte on administrative leave and then decided to terminate his employment effective October 2, 2019. That same day, UBS also placed White, Penrod and, later, Sam McCoy, on administrative leave.

49. On October 7, 2019, White and Penrod, along with another team financial advisor, Sam McCoy, resigned from UBS.

50. That same day, Platte, White, Penrod and McCoy all became employed by Morgan Stanley. In addition, support staff employees on Platte's team at the UBS New Albany branch also resigned to join Morgan Stanley. Platte also solicited these UBS employees in violation of his non-solicitation agreement and duty of loyalty.

51. Morgan Stanley has also recently hired a number of former UBS staff employees connected to Platte in the Columbus market. This included Vicki Gramlich, a long-time Client Sales Assistant at the New Albany Branch, who left UBS in August 2019, purportedly to relocate to South Carolina and retire. Gramlich had worked closely with Platte over the years, and Platte advocated for her to receive a separation package from UBS. Gramlich did not retire, but instead joined Morgan Stanley. Upon information and belief, Platte knew of Gramlich's plan when he

14

advocated for her separation package, and Platte facilitated Gramlich's departure from UBS and subsequent employment at Morgan Stanley.

### Platte, White, And Penrod Immediately Begin Soliciting Clients

52. As discussed above, Defendants were subject to written agreements at the time of their separations from UBS prohibiting them from (a) soliciting clients and (b) possessing, disclosing, or using any confidential UBS client information.

53. Notwithstanding these obligations, Platte, White, and Penrod all immediately began contacting the UBS clients they had serviced to solicit them on behalf of Morgan Stanley.

54. Upon information and belief, Platte, White, and Penrod have used confidential UBS customer information to facilitate their communications with clients in person and by cell phone calls, texts, and emails.

55. Several clients that Platte, White, and Penrod serviced at UBS have already started to move their business to Morgan Stanley and have notified UBS that they already have been contacted by Platte, White, Penrod and their team at Morgan Stanley.

### COUNT I—BREACH OF CONTRACT

56. UBS incorporates all of the foregoing Paragraphs as though fully set forth herein.

57. In connection with their employment at UBS, Defendants entered into various agreements set forth above prohibiting them from (a) soliciting clients and (b) possessing, disclosing or using any confidential UBS client information.

58. Platte also entered into the BOM Agreement, prohibiting him from recruiting, influencing, and inducing UBS employees to leave their employment at UBS.

59. All of the agreements were supported by adequate consideration, as set forth above, and contain reasonable post-employment restrictions that are necessary to protect UBS's legitimate business interests.

60. UBS performed and fulfilled its obligations under the agreements.

61. By and through their actions as set forth above, including Platte's recruitment of UBS employees, Defendants' solicitation of clients, and Defendants use and disclosure of UBS's confidential information, Defendants have breached their contractual obligations to UBS.

62. As a direct and proximate result of Defendants' breaches of their agreements, UBS has suffered and will continue to suffer substantial harm and damages. The New Albany teams that have left UBS to go to Morgan Stanley serviced millions of dollars in annual client revenue.

63. Defendants' breaches are ongoing and will continue to cause UBS irreparable harm. UBS has no adequate remedy at law.

## COUNT II—INJUNCTIVE RELIEF

64. UBS incorporates all of the foregoing Paragraphs as though fully set forth herein.

65. Unless Defendants are enjoined from the aforementioned conduct and from further breaching their agreements with UBS, UBS will continue to be irreparably harmed by the loss of goodwill, loss of reputation, and loss of customers and business.

66. UBS has already suffered and will continue to suffer irreparable injury and harm to its business, and monetary damages are an inadequate redress for such continuing injury.

67. UBS has no adequate remedy at law and is entitled to injunctive relief.

WHEREFORE, UBS demands judgment for preliminary injunctive relief, pending FINRA arbitration, that:

A. Enjoins Platte from soliciting, influencing, inducing, recruiting or causing any employee of UBS to terminate his or her employment with UBS for the purpose of joining, associating or becoming employed with Morgan Stanley;

B. Enjoins Defendants from soliciting UBS clients in violation of their agreements with UBS;

C. Enjoins Defendants from using or disclosing UBS's confidential information;

D. Enjoins Defendants from otherwise violating the terms of their agreements with UBS; and,

E. Requires Defendants to immediately return to counsel for UBS all originals, copies or other reproductions, in any form whatsoever, of any of UBS's confidential information, trade secret information, and other property.

UBS further demands such other and further relief, legal and equitable, that this Court deems just and proper.

Respectfully submitted,

*/s/ Jeffrey S. Hiller*
Jeffrey S. Hiller, *Trial Attorney* (#0081533)
Chad J. Kaldor (#0079957)
LITTLER MENDELSON, P.C.
21 East State Street, 16th Floor
Columbus, OH  43215
Telephone:  614.463.4230
Facsimile:  614.573.7475
E-mail:  jhiller@littler.com
ckaldor@littler.com

*Attorneys for Plaintiff*

4844-4490-5641.3 094275.1000
10/11/19